IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBIN LYNN GRESSER,

      Petitioner,

   v.

STEVE FRANKE,

      Respondent.

Case No. 2:12-cv-02073-HZ

OPINION AND ORDER

Alison M. Clark, Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

    Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Kristen E. Boyd, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

    Attorneys for Respondent


1 - OPINION AND ORDER

HERNANDEZ, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his state-court convictions for Unlawful Sexual Penetration and Sexual Abuse. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) is denied.

### BACKGROUND

In September 2003, petitioner was indicted in Douglas County on charges of Unlawful Sexual Penetration with a Foreign Object in the First Degree and Sexual Abuse in the First Degree for crimes committed against a 10-year-old girl. Respondent's Exhibit 102. The charges arose out of two separate incidents: (1) in mid-July, 2003, the victim spent the night at petitioner's home where she claimed he sexually abused her; and (2) in late July or early August, the victim contended that petitioner sexually abused her during a day trip to a local river.

The victim in this case, FHG, complained to her mother after returning from the overnight stay at petitioner's house that she felt pain in her abdomen below her stomach and was experiencing vaginal bleeding. Trial Transcript, pp. 66. FHG's mother saw the blood on FHG's underwear and mistakenly believed her daughter's

physical symptoms were the result of her first menstrual cycle.[1]
*Id* at 166.

Approximately a month and a half later, FHG told her mother
that while she was at petitioner's house for the overnight stay in
mid-July, "she woke up on the couch, and then [petitioner] was
standing over her, and he carried her to his room and then pulled
his pants down, and then just told her to pull her pants back up
and go back out there on the couch." *Id* at 170.  FHG did not
describe any touching, and the mother did not pursue the matter.
*Id*.  In fact, petitioner continued to visit FHG's family residence
even after FHG related this information to her mother.  *Id* at 171.

FHG later told a neighbor, Tera Frost, that petitioner had
inappropriately touched her.  This prompted Frost to tell FHG's
parents about this conversation.   Despite this, Frost saw
petitioner at FHG's family residence again some days later.  *Id* at
35.  Frost was "dumbfounded" that petitioner had returned to the
residence and took FHG to the home of Zena Delaney, Frost's mother,
because Frost felt she needed advice.  *Id* at 36-37.  FHG told Frost
and Delaney that petitioner had in appropriately touched her during
the night that she spent at his house, and that it had also
happened when she was alone with him during a family outing at the
river.  *Id* at 42-43. She also told Frost, "I want him to go to jail

---

[1]  As of the time of petitioner's trial in 2005, FHG had
still not begun menstruating.  Trial Transcript, p. 67.

because I don't want him to do it to my little sister. . . ." *Id* at 36. Delaney called the police, thus bringing the incidents to the attention of the authorities.

At petitioner's subsequent trial, the prosecutor asked Frost to comment on FHG's credibility:

|  |  |
|---|---|
| Prosecutor: | Did [FHG] ever tell you things that sounded outlandish or like lies? |
| Frost: | No. |
| Prosecutor: | Did she ever try to get your attention in ways that were negative? |
| Frost: | No. |

*Id* at 35.

Shortly thereafter, the following exchange occurred between Delaney and the prosecutor:

|  |  |
|---|---|
| Prosecutor: | Okay. Now, after [FHG] told you what she did, what did you do? |
| Delaney: | I called the police, and first I called [FHG]'s mom, and then I called the police and told them there's a little girl here that needs to talk to them because I didn't know what to do. I knew this little girl had been-you could tell she was telling the truth. I mean she's[-]you could just tell. |
| Prosecutor: | What was her demeanor? I mean, was she crying, was she laughing, was she — while she was telling you this? |
| Delaney: | She was very solemn, just very — no expression on her face, just like a scared little girl, and she was saying it how it was without skipping anything, without — this little girl was flat |

4 - OPINION AND ORDER

                              telling the story like if you would see
                              it on a television show.  I mean that's
                              how point blank this little girl was at
                              telling her story.

*Id* at 43.  Counsel for petitioner did not object to either Frost's

or Delaney's comments on FHG's credibility.

     Dr. Curtis Oddo, the State's medical expert, also testified at

trial.  He testified that FHG "was obviously troubled by her

disclosure" which was evident from "her body position, and the way

she disclosed, it was obviously uncomfortable or, you know,

somewhat painful for her to talk about."  *Id* at 152-53.   His

physical examination was normal, although he did note there was an

indentation in her genital area that could have been the result of

sexual abuse, or was something she could have been born with.  *Id*

at 151.  In this regard, he could not rule out sexual abuse based

upon the physical exam and he ultimately concluded that FHG had

been the victim of sexual abuse based upon "the history from [FHG]

herself and the physical exam."  *Id* at 155-57.

     FHG testified that petitioner had touched her vagina with his

hand when she spent the night at his home, but provided conflicting

testimony as to whether petitioner had inserted his finger into her

vagina (pertaining to the Sexual Penetration charge):

     Prosecutor:    Okay.  What did he do with his hand when
                    it was on you, anything?

     FHG:           No.

     Prosecutor:    Okay.  Did he touch you in any other way?

     5 - OPINION AND ORDER

FHG:            No.

Prosecutor:     Okay.  Besides touching your vagina, did
                he put anything in your vagina?

FHG:            No.

Prosecutor:     Did he put his finger in it?

FHG:            No.

Prosecutor:     No.  Okay.  Did you tell people that he did?

FHG:            If I did, I must have did it like on an
                accident.

Prosecutor:     If you said that you must have said it on
                an accident?

FHG:            Yeah.

Prosecutor:     Okay.  You don't remember his finger going
                inside you?

FHG:            No.

Prosecutor:     Okay.  You don't remember telling people
                that and telling people that it hurt it –
                hurt it.  I'm sorry.  That it hurt when
                that happened?

FHG:            Yes, I do remember.

Prosecutor:     Okay.  And I don't want to try to pull
                teeth out of you because I'm not supposed
                to try to do that.  Did he put his finger
                inside your vagina?

FHG:            No.

Prosecutor:     No.  I thought you just said that you
                remembered he did?  I'm sorry, [FHG], I'm not
                trying to make this hard, but . . .

FHG:            Well, he did.

Prosecutor:     He did what?

```
FHG:            He put his fingers in my vagina.

Prosecutor:     And did that hurt?

FHG:            A little bit.
```

*Id* at 62-64.

Among petitioner's witnesses was his ex-wife, Ladonna Gresser ("Ladonna"). At the time petitioner was alleged to have molested FHG at his home during the sleep-over, the Gressers' divorce was pending and Ladonna had moved into her mother's home. She had, however, spent the night with petitioner on the night in question in part because it was their anniversary. *Id* at 188-92, 274-75. Ladonna testified that she slept with petitioner and did not think it was possible that petitioner could have molested FHG that night. *Id* at 207.

At the conclusion of the trial, the jury convicted petitioner on both counts by votes of 10-2. *Id* at 409. As a result, the trial court sentenced him to concurrent prison sentences of 100 and 75 months, respectively.

Petitioner took a direct appeal, and the Oregon Court of Appeals affirmed the trial court's decision without opinion, and the Oregon Supreme Court denied review. *State v. Gresser*, 222 Or. App. 213, 193 P.3d 629, *rev. denied*, 345 Or. 415, 197 P.3d 1104 (2008).

Petitioner next filed for post-conviction relief ("PCR") in Umatilla County where the PCR trial court denied relief on his

7 - OPINION AND ORDER

claims.  Respondent's Exhibit 150.  The Oregon Court of Appeals affirmed the lower court without opinion, and the Oregon Supreme Court denied review.  *Gresser v. Mills*, 248 Or. App. 262, 274 P.3d 896, *rev. denied*, 352 Or. 25, 281 P.3d 261 (2012).

Petitioner filed this habeas corpus action on November 14, 2012 raising 11 grounds for relief.  Respondent asks the court to deny relief on petitioner's claims because five of the claims are procedurally defaulted, and the PCR trial court's decision denying relief on the remaining six claims did not involve an unreasonable application of clearly established federal law.

## DISCUSSION

### I.    Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that

contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id* at 409.

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the court independently reviews the record, it still lends deference to the state court's ultimate decision. *Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

///

///

9 - OPINION AND ORDER

## II.  Unargued Claims

The Petition for Writ of Habeas Corpus presents 11 grounds for relief which raise a variety of ineffective assistance of counsel claims as well as one claim of trial court error.  In his supporting memorandum, petitioner chooses to brief only the issues of whether he suffered from the ineffective assistance of trial counsel when counsel failed to: (1) object when witnesses Delaney and Frost vouched for the credibility of the victim (Grounds B & C); and (2) object when Dr. Oddo rendered his expert opinion that FHG was the victim of abuse based upon what she told him, thereby improperly commenting on her credibility (Grounds G & I).

Petitioner does not argue the merits of his remaining claims, nor does he address any of respondent's arguments as to why relief on these claims should be denied.  As such, petitioner has not carried his burden of proof with respect to these unargued claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner bears the burden of proving his claims).  Even if petitioner had briefed the merits of these claims, the court has examined them based upon the existing record and determined that they do not entitle him to relief.

## III. Grounds B & C: Vouching by Frost and Delaney

Petitioner alleges trial counsel was constitutionally ineffective when he failed to object to vouching testimony from Delaney and Frost.  Because no Supreme Court precedent is directly

on point that corresponds to the facts of this case, the court uses the general two-part test established by the Supreme Court to determine whether petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 129 S.Ct. at 1420.

Petitioner asserts that when Delaney testified that "you could just tell [FHG] was telling the truth[,]" this constituted improper vouching for the victim's credibility in violation of Oregon law.

11 - OPINION AND ORDER

He also claims the prosecutor invited vouching when she asked Frost, "Did [FHG] ever tell you things that sounded outlandish or like lies?" Petitioner argues counsel was obligated to object in each of these instances, and that his failure to do so in a close case which turned on witness credibility violated the standard announced in *Strickland*.

Counsel filed an affidavit with the PCR trial court wherein he stated the following:

> 16. I find it helpful to object only when there is a good reason to object and when I believe it will be likely to succeed. I do not want the jury to think that I am hiding information by constantly objecting. That irritates and alienates the jury. Therefore, I exercise discretion and moderation in my objections.

> 17. I did not object to Ms. Delaney testifying that she thought the victim was telling the truth when she reported her story. Ms. Delaney appeared to be further explaining her decision to call the police, and the testimony would have been admissible for that purpose, in my view. Moreover, I did not want to highlight that statement for the jury by objecting to it.

Respondent's Exhibit 142, p. 4.

The PCR trial court resolved all of petitioner's claims by adopting the reasoning from the State's trial memorandum:

> In this case Petitioner has set forth scores of claims, most containing multiple sub-claims, alleging that his trial counsel was ineffective. I have spent many hours poring over the allegations, the trial transcript and

12 - OPINION AND ORDER

> the hodgepodge of exhibits, opinions,
> suppositions, erstwhile claims and sub-claims.
> I would have to spend many more hours writing
> findings in this case, only to end up with
> essentially the same analysis and conclusions
> as that provided in the Defendant's Trial
> Memorandum filed in the case.  Rather than do
> that, I find that the analysis and conclusions
> contained in Defendant's memorandum clearly,
> cogently and accurately reflect my own
> analysis.  Based upon that finding, I further
> find that the Petitioner has failed to prove
> any of his claims or sub-claims by a
> preponderance of the evidence and all of his
> claims and sub-claims fail.

Respondent's Exhibit 150, p. 4.

Petitioner first asserts that the PCR trial court's wholesale adoption of the analysis from the State's trial memorandum requires a more careful habeas corpus examination because it shows the perfunctory nature of the state court's review.  To the contrary, the trial judge spent many hours poring over the case before incorporating the State's reasoning into his Judgment.  This court will, of course, remain careful and vigilant in its analysis, but sees no reason to review this case differently based upon the style of the PCR trial court's decision.

The PCR trial court's decision addressed petitioner's claims pertaining to Delaney and Frost in terms of their admissibility under based upon principles of relevance and hearsay.  Respondent's Exhibit 139, pp. 28-31.  It concluded that the introduction of the FHG's out of court statements via Frost and Delaney were proper under the Rules of Evidence.  *Id.*  It also determined that even

assuming Delaney's testimony was improper, petitioner did not suffer any prejudice because "a wide variety of other witnesses testified to essentially the same evidence." *Id* at 30.   The PCR trial court's decision did not, however, specifically address the central issue in this case: whether the statements at issue constituted improper vouching for FHG's credibility, and if so, whether the improper vouching had a prejudicial impact upon petitioner's trial.  As a result, the court conducts an independent review of the record as to these claims.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

"[I]n Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or. 427, 438 (1982).  In the context of psychotherapist testimony, the Oregon Supreme Court emphatically reaffirmed its stance six years after *Middleton*: "We have said before, and we will say it again, but this time with emphasis – we really mean it – *no psychotherapist may render an opinion on whether a witness is credible in any trial conducted in this state.* The assessment of credibility is for the trier of fact and not for psychotherapists." *State v. Milbrandt*, 305 Or. 621, 756 P.2d 620, 629 (1988) (emphasis in original). In 2010, the Oregon Supreme Court again revisited this topic and recognized, "This court has long held that one witness may not give an opinion on whether he or she believes another witness is telling the truth." *State v.*

*Lupoli*, 348 Or. 346, 357 (2010).  It instructed, "Applying that principle is a straightforward matter when one witness states directly that he or she believes another witness, or that the other witness is honest or truthful."  *Id.*

Delaney testified that one could tell FHG was telling the truth about the abuse, and Frost testified, essentially, that FHG was a truthful person.  Under Oregon law, these are direct comments on the credibility of FHG and, therefore, strictly prohibited.[2] Counsel did not explain why he did not object to Frost's vouching, and claimed he made a strategic decision not to object to Delaney's comment on FHG's credibility because he feared highlighting that testimony to the jury.

Frost testified prior to Delaney.  During Frost's direct examination, the prosecutor asked a question that should have immediately raised red flags for counsel: "Did [FHG] ever tell you things that sounded outlandish or like lies."  Trial Transcript, p. 35.  This provided counsel with a clear opportunity to object before Frost answered, but he did not do so.  As a result, Frost's

_____

[2]  Respondent directs the court's attention to *Easter v. Mills*, 239 Or. App. 209 (2010) for the proposition that the statements at issue in this case did not constitute improper vouching.  *Easter* is distinguishable from petitioner's case insofar as the statements at issue in that case did not involve a direct commentary on the credibility of the victim, but rather were aimed at determining whether the victim had any specific motive to lie where the defense theorized that the child victim was motivated to lie about the abuse because she was angry with the defendant and his daughter.  *Id* at 214.

15 - OPINION AND ORDER

improper comment on the victim's credibility was entered into evidence. Thereafter, it was critical that counsel not allow Delaney to reinforce this credibility testimony with additional, inadmissible testimony. As a result, the court finds counsel's performance fell below an objective standard of reasonableness when he failed to object to the improper vouching from Delaney and Frost.

The court must next determine whether petitioner was prejudiced as a result of counsel's deficient performance. Respondent argues that petitioner does not sufficiently prove prejudice and, instead, relies upon unargued, procedurally defaulted claims based upon the prosecutor's allegedly improper closing argument which are ineligible for consideration. While the court must consider the totality of the evidence in assessing prejudice, *Strickland*, 466 U.S. at 695, a prosecutor's closing argument is not, itself, evidence. As such, and because petitioner's claims predicated on the prosecutor's closing argument

are not preserved for habeas corpus review,[3] the closing argument does not factor into the prejudice inquiry.

Nevertheless, petitioner's case does tend to indicate prejudice. Where credibility was of paramount importance, counsel's failure to object to Frost's and Delaney's improper comments on FHG's credibility could be seen as very damaging. This is especially true where: (1) FHG gave conflicting testimony pertaining to the Unlawful Sexual Penetration charge when she repeatedly denied that it occurred before suddenly changing her testimony; (2) petitioner's then-estranged wife testified that she spent the night with him and he could not possibly have done what FHG alleged; and (3) despite the improper testimony on FHG's credibility, petitioner was narrowly convicted on each charge by a vote of 10-2.

There are, however, countervailing considerations that could have overcome any prejudice from the improper testimony pertaining to FHG's credibility. It was uncontroverted that FHG experienced

_____

[3] In the PCR trial court, petitioner alleged that trial counsel was ineffective with respect to actions of the prosecutor, including when counsel: (1) failed to move for a mistrial during the State's closing when the prosecutor gave the impression that she had seen evidence not admitted at trial; (2) failed to object when the prosecutor vouched for witnesses for the State; and (3) failed to object when the prosecutor offered her personal opinion about the evidence offered at trial. Respondent's Exhibit 111. Petitioner did not pursue these claims on appeal, and they are now procedurally defaulted. Respondent's Exhibits 152-153.

abdominal pain and vaginal bleeding on the very morning she returned to her home from petitioner's residence where she ultimately alleged he had first abused her. In addition, while Dr. Oddo testified that FHG's examination was normal, he did note that an unusual indentation in her genital area could have been the result of sexual abuse.[4]    Moreover, the jury was given the opportunity to assess FHG's credibility both on the witness stand, and by viewing the CARES videotape made shortly after Delaney brought FHG's allegations to the attention of the authorities. Trial Transcript, p. 126.    Given this evidence, the outcome of petitioner's trial might not have changed regardless of counsel's failure to object to the improper comments on FHG's credibility.

It is important to reiterate that in habeas corpus cases, the inquiry is not what this court would do if presented with petitioner's claims for a *de novo* review, but whether the PCR trial court's decision denying relief on them is not just wrong, but an unreasonable application of U.S. Supreme Court precedent.    To prevail, petitioner must "show that the state court's ruling on the claim[s] being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

---

[4]    In fact, Dr. Oddo testified that the physical exam was one basis for his conclusion that FHG had been the victim of sexual abuse.    Trial Transcript, p. 155.

disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011).
It is debatable whether the failure to object to two improper
comments on credibility under the circumstances of this case
resulted in prejudice to petitioner.  Upon an independent review of
the record, because the prejudice inquiry in this case does not
command a result that is beyond any possibility for fairminded
disagreement, the court concludes that petitioner is not entitled
to habeas corpus relief on Grounds B and C.

## IV.  Grounds G & I: Dr. Oddo's Testimony

Petitioner next alleges that trial counsel was ineffective for
failing to object when the State's expert witness testified that
FHG had been the victim of abuse despite categorizing her physical
exam as "normal," thereby implying that FHG's allegations were
credible.  At the time of petitioner's trial in 2005, Oregon law
allowed a medical expert to testify to a diagnosis of sexual abuse
even if that diagnosis was based entirely upon what the victim told
the expert.  *State v. Wilson*, 121 Or. App. 460, 462-67 (1993).
Although the Oregon Supreme Court later determined in 2009 that
this kind of testimony did, in fact, constitute an improper comment
on witness credibility, *State v. Southard*, 347 Or. 127, 142 (2009),
counsel was not constitutionally required to anticipate this result
in 2005.  *See Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th
Cir. 2004).  Accordingly, the PCR trial court's decision denying

relief upon this claim is neither contrary to, nor an unreasonable application of, clearly established federal law.

## CONCLUSION

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) is DENIED. The court grants a Certificate of Appealability Grounds B and C on the basis that petitioner has made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this ___20___ day of March, 2014.

_____
Marco A. Hernandez
United States District Judge

20 - OPINION AND ORDER